# THE DWYER LAW FIRM, L.L.C.

### 17 ACADEMY STREET, SUITE 1010
### NEWARK, NEW JERSEY 07102



**ANDREW DWYER***

**(973) 242-3636**
FAX (973) 242-3399

*ADMITTED IN NJ & NY

July 2, 2007

Hon. Claire C. Cecchi, U.S.M.J.
United States District Court
District of New Jersey
MLK. Federal Building & Courthouse
50 Walnut Street
Newark, New Jersey 07102

     **Re:**   <u>**Thomas K. Dawes v. Local 375, et al.,**</u>
           **Civil Action No. 04-4002 (JLL)(CCC)**

Dear Judge Cecchi:

     This office represents the plaintiff in the above-referenced matter. I am writing in response to the various letters submitted to Your Honor from the defendants in this matter requesting that discovery be re-opened.

     Initially, I apologize for not submitting our response on June 27th. I remained on trial through the end of Friday, June 29th, and I simply was unable to review the defendants' various submissions on time.

     Defense counsel all seek to re-open discovery, but they do ***not*** all seek the same relief. Defendants DC 37 and AFSCME ***only*** seek to re-open discovery on the issue of ***damages and mitigation.*** Defendant Local 375, however, also seeks to re-open discovery on liability issues that go to the heart of the dispute in this case. DC 37 and AFSCME do ***not*** appear to join in this broader request to re-open discovery on issues related to liability.

     These are very different requests. The request to re-open discovery on damages and mitigation is, generally, a request we do not oppose. The request to re-open discovery on the issue of liability, however, is one we strongly oppose.

     **Relevant Procedural and Factual Background.** This case was filed in State court in April, 2004. It was removed to this Court in August, 2004. All defendants were represented by the same law firm, Cohen, Weiss & Simon. While defendants now claim there is a conflict of interest, they have never explained the nature of the conflict, when it arose, or how (if at all) it supposedly impaired the representation afforded by defense counsel. While defendants now

Hon. Claire C. Cecchi, U.S.M.J.
July 2, 2007
Page 2 of 5

claim that prior counsel did an inadequate job of exploring damages issues, there
is no suggestion that he failed to address liability issues in discovery. Further,
there is no explanation why there would be any conflict among the defendants on
any liability issue.

If one examines the letter submitted on behalf of Local 375 carefully, it will
be apparent that (apart from damages) all "discovery" now sought on liability
relates to whether "charges" were filed against plaintiff under the union
Constitution. See Letter of Ira Cure, at 4. This is not a new issue in this case.
On the contrary, this issue has been present in this case from the very beginning.
Further, contrary to the argument of Local 375, it was alleged from the very
beginning that plaintiff's rights derived from his status as a *union member*. The
original Complaint specifically alleges plaintiff was a union *member*, because he
was automatically afforded that status as a staff *employee* of Local 375. The
Complaint further alleges plaintiff's rights derive from his status as a union
member. Complaint, ¶¶ 15-16, 24. [A copy of the Complaint is annexed hereto
as Exhibit A.] The Complaint describes, in great detail, the various procedural
rights afforded any union member against whom "charges" are brought.
Complaint, ¶¶ 24-25, 30-36.

The Complaint alleges plaintiff was retaliated against in violation of the Bill
of Rights, and that the retaliation took the form of disciplinary action imposed on
him. Complaint, ¶¶ 43-44. The Complaint further alleges that the retaliatory
disciplinary action "was also undertaken in complete violation of the procedural
guarantees specified in the Bill of Rights and specified in other provisions in the
International Constitution and the Local 375 Constitution." Complaint, ¶ 44.

The Complaint specifically alleges that charges were brought:

51.  Immediately following these complaints of retaliation, *a set
of written charges were prepared against plaintiff*, in a memo dated
October 5, 1998, from Mel Levy, a member of the Executive Committee of
Local 375.

Complaint, ¶ 51 (emphasis added). The Complaint then makes various
allegations about how these "charges" were handled procedurally, and in
particular, alleges that the Union initially recognized that "charges" had been
brought, and therefore certain procedural guarantees had to be respected.
Complaint, ¶¶ 52-57. However, the Complaint alleges that plaintiff was then
fired, without any of the procedural guarantees being met. The Complaint
alleges that "[p]laintiff was given no notice of the charges against him, and no
opportunity to respond to those charges." Complaint, ¶ 60.

Hon. Claire C. Cecchi, U.S.M.J.
July 2, 2007
Page 3 of 5

Thus, plaintiff has always alleged that his rights as a union member were violated as a result of the charges brought against him, resulting in his firing.

Plaintiff was deposed on August 4, 2005.  At his deposition, he was questioned extensively regarding why he believed the "charges" brought against him were charges under the union Constitution.  [A copy of relevant excerpts from the deposition are annexed hereto as Exhibit B.]  He was also questioned for over 20 pages about damages and mitigation efforts.

Following discovery, the parties drafted a Final Pretrial Order.  In the Order, the parties stipulated that "[p]laintiff was a member of AFSCME and of Local 375 at all times relevant herein."  The parties also stipulated that under the AFSCME and Local 375 Constitutions, certain procedural rights are afforded for any union member against whom charges were brought.  Stipulated Facts, ¶¶ 12-23.  Finally, the parties stipulated that plaintiff was not afforded any of these procedural guarantees in connection with his termination.  Stipulated Facts, ¶¶ 27-28.  [Excerpts of the Final Pretrial Order are annexed hereto as Exhibit C.]

Subsequent to the Final Pretrial Order, the parties submitted competing summary judgment motions.  There was no dispute that plaintiff had been fired, and no dispute that none of the procedural requirements under the Constitution had been followed.  The dispute turned on whether "charges" had been brought against plaintiff.  In this regard, defendants submitted a Declaration of Larry P. Weinberg, AFSCME's General Counsel, who explained how the Constitution should be interpreted.  He stated:

> **If charges are filed against a staff employee** by a member pursuant to Article X, Section 2, **such staff employee is afforded the right to have a hearing and a review of any discipline imposed in accordance with the procedures set forth in Article X of the International Constitution**.

Weinberg Decl., ¶ 5 (Feb. 2, 2006) (emphasis added).  Thus, defendants themselves admitted that if charges were filed against plaintiff as a "staff employee," then plaintiff as a "staff employee" would be "afforded the right to have a hearing and a review" of "any discipline imposed."  This is, of course, precisely the basis for plaintiff's claim in this case: charges were filed against him, but he was not afforded a hearing and review of the discipline imposed.  [A copy of Mr. Weinberg's Declaration is annexed hereto as Exhibit D.]

In response to defendants' summary judgment motion, we submitted the Declaration of Roy Commer, who was the President of Local 375, at the time the charges were brought against plaintiff in 1998.  Mr. Commer specifically stated that plaintiff's termination was the result of "charges" that had been brought

Hon. Claire C. Cecchi, U.S.M.J.
July 2, 2007
Page 4 of 5


against him, under the Union Constitution. [A copy of Mr. Commer's Declaration is annexed hereto as Exhibit E.]

In denying defendants' summary judgment motion, the Hon. Jose L. Linares, U.S.D.J., correctly understood the issue as follows:

[I]f charges are brought in accordance with the Constitution, then it is undisputed that the procedural protections apply. Defendants concede that Plaintiff was fired without any of the procedures described in the AFSCME Constitution. Therefore, the issue remaining to be decided is whether charges were brought against Plaintiff pursuant to the AFSCME Constitution.

Summary Judgment Slip Opinion, at 15 (Sept. 7, 2006) (hereinafter "Slip Op."). Judge Linares correctly found that this was a disputed issue of fact, particularly given the Commer Declaration, and denied summary judgment.

**Discovery Regarding Damages/Mitigation.** Respectfully, I disagree that there has been no discovery regarding damages or mitigation. Defense counsel questioned plaintiff at deposition about his economic damages since the date of his termination in 1998, as well as his mitigation. We also supplied various documents regarding damages and mitigation. The fact that defense counsel did not ask more detailed questions is not a basis for re-opening discovery.

Nonetheless, we agree that simply because of the passage of time, *all parties* should be required to update discovery on damages and mitigation. We have no objection to plaintiff serving supplemental documents regarding his damages and mitigation efforts. Likewise, we would like to have updated discovery on the compensation paid to persons in plaintiff's job category since 1998 (because that goes to plaintiff's economic loss). We are opposed to permitting a re-deposition of plaintiff, because we submit this discovery should be able to proceed pursuant to written demands (we are in the process of gathering some of the information defendants have informally requested in the last two weeks). Also, I should note that I do not agree with defendants' suggestion that they be given unlimited access to plaintiff's tax returns. Plaintiff's W-2 and 1099 statements, and any Schedule C income, is relevant. However, plaintiff's various deductions (e.g., for medical expenses, alimony, charitable gifts, etc.) is not relevant to damages, and should not be disclosed.

**Discovery Regarding Liability.** By contrast, there is no justification to re-open discovery on liability. Defense counsel's claim that she did not know that plaintiff was claiming he was fired as a result of "charges" brought against him in the fall of 1998 is nonsense -- this is clearly spelled out in the Complaint. In an attempt to claim "surprise," Local 375 now claims that it did not previously

Hon. Claire C. Cecchi, U.S.M.J.
July 2, 2007
Page 5 of 5

understand that plaintiff's rights as a "staff employee" turned on his rights as a
"union member," and they contend that plaintiff is improperly "conflating" the two
statuses. In reality, however, AFSCME's own Larry Weinberg averred that this is
a distinction without a difference, and that "[i]f charges are brought against a staff
employee," then the "staff employee" is entitled to the protections of the
Constitution for "any discipline imposed." Thus, Mr. Weinberg drew no distinction
between whether "charges" were brought against plaintiff "as a staff employee" or
"as a union member." Neither did Judge Linares; the question was simply
whether charges were brought against plaintiff, period. Slip Op. at 15. Local
375's belated attempt to draw a distinction between the plaintiff's status as a
union member and as a staff employee is pure sophistry, and provides no basis
for reopening discovery on any liability issue.

But, if this Court is inclined to reopen discovery on liability, then we
request that the discovery not be one-sided. If defendants are now going to
claim -- contrary to Mr. Weinberg's Declaration -- that there is a distinction
between charges brought "as a staff employee" and charges brought "as a union
member," then we would request the right to depose Mr. Weinberg, who has
been presented as the authoritative voice on interpreting the AFSCME
Constitution. We believe such a deposition would conclusively show that if
charges were brought against plaintiff "as a staff employee" then such charges
would trigger the Constitution's guarantees for plaintiff "as a staff employee" for
"any discipline imposed."

Again, reopening discovery limited to damages is not extraordinary, given
the passage of time that has elapsed since discovery was last exchanged on this
issue. But reopening discovery on a liability issue -- which has already been fully
litigated in this case -- would be extraordinary indeed. The request for limited
discovery on damages and mitigation should be granted (for all parties), but the
request for discovery on whether "charges" were brought should be denied.

Thank your for your courtesies.

Respectfully yours,

THE DWYER LAW FIRM, L.L.C.

Andrew Dwyer (AD-7793)

Cc:    Thomas Dawes
       Hanan B. Kolko
       Judith Broach
       Barry I. Levy

# EXHIBIT A

DWYER & DUNNIGAN, L.L.C.
17 Academy Street, Suite 1010
Newark, New Jersey 07102
(973) 242-3636
Attorneys for Plaintiff

| | | |
|---|---|---|
| THOMAS K. DAWES, | : | SUPERIOR COURT OF NEW JERSEY LAW DIVISION: ESSEX COUNTY |
| Plaintiff, | : | |
| | : | Docket No. ESX-L- |
| v. | : | Civil Action |
| LOCAL 375, CIVIL SERVICE TECHNICAL GUILD, DISTRICT COUNCIL 37, AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES, AFL-CIO, | : | **COMPLAINT AND JURY DEMAND** |
| | : | |
| | : | |
| | : | |
| Defendants. | : | |

Thomas K. Dawes, residing at 125 Midland Avenue, Montclair, New

Jersey, as and for his Complaint, states:

1.    Thomas K. Dawes, plaintiff herein, is a citizen of the United

States residing in the State of New Jersey, County of Essex.

2.    Local 375, Civil Service Technical Guild (hereinafter "Local

375"), is a labor organization, an unincorporated association with a place of

business at 125 Barclay Street, New York, New York 10007.

3.    At all material times herein, Local 375 has been a chartered

subordinate body of a multi-state labor organization, the American Federation

of State, County and Municipal Employees, AFL-CIO (hereinafter "AFSCME"),

which maintains its national headquarters in Washington, D.C.

1

4.     District Council 37 (hereinafter "DC 37") is an affiliate of
AFSCME which is also affiliated with several local unions, including Local
375, to whom it provides various services and benefits.

5.     Local 375, DC 37 and AFSCME are hereinafter collectively
referred to as "defendants."

6.     On or about July 31, 1995, plaintiff became employed full-time
with defendants as a union organizer, with the specific title of Senior Business
Representative.

7.     Plaintiff remained continuously employed with defendants until a
meeting of Local 375's Executive Board was held on November 4, 1998, at
which time the Board acted to terminate plaintiff's employment effective
November 6, 1998.

8.     During the period of plaintiff's employment with defendants, in or
about June, 1997, plaintiff moved his residence to New Jersey, initially
residing at 601 Grove Street, Montclair, New Jersey.

9.     After moving to New Jersey in or about June, 1997, plaintiff has
continuously resided in New Jersey, during the remainder of his employment
with defendants, and continuing up to the present.

10.     During the period of his employment, plaintiff consistently
performed his duties for defendants in an efficient manner and in fulfillment of
his employer's legitimate expectations.

11.     During the period of plaintiff's employment, AFSCME had an
International Constitution.

12. AFSCME's International Constitution was widely distributed to all AFSCME members with the intention and expectation that they would rely thereupon.

13. The benefits in the International Constitution were intended, at least in part, to provide an incentive for employees to be members of AFSCME.

14. Under the terms of the International Constitution, "any person" who meets any of the requirements specified in the International Constitution for membership "shall be eligible for membership in a local union duly chartered by and regularly affiliated with" AFSCME.

15. In addition to other categories specified in the International Constitution, membership is extended to any "full-time staff employee of any subordinate body of the Federation [AFSCME]. If employed by a local union, such employee shall be eligible for membership in the local union by which such employee is employed."

16. As a full-time staff employee of defendants, therefore, plaintiff was a member of AFSCME and of Local 375, at all times relevant herein.

17. Defendants also widely distributed a copy of the International Constitution to its employees and members, including plaintiff, with the intention and expectation that the employees would rely thereupon.

18. Local 375 also adopted its own Constitution for its members.

19.     Local 375 prepared and widely distributed the Local 375 Constitution to its employees, including plaintiff, with the intention and expectation that they employees would rely thereupon.

20.     The benefits in the Local 375 Constitution were intended, at least in part, to provide an incentive for employees to be members of Local 375.

21.     Plaintiff was provided with a copy of both the AFSCME International Constitution and a copy of the Local 375 Constitution.

22.     Plaintiff read the provisions of both the AFSCME International Constitution and the Local 375 Constitution and relied thereon in continuing to work for defendants.

23.     The AFSCME International Constitution and the Local 375 Constitution both form a binding contract between plaintiff and defendants.

24.     As a member of AFSCME and Local 375, plaintiff was entitled to the benefits of the "Bill of Rights for Union Members," which is specified in the International Constitution, and which states in part as follows:

> 2.     Members shall suffer no impairment of freedom of speech concerning the operations of this union.  Active discussion of union affairs shall be encouraged and protected within this organization.
>
> 3.     Members shall have the right to conduct the internal affairs of the union free from employer domination.
>
> 4.     Members shall have the right to fair and democratic elections, at all levels of the union.  This includes due notice of nominations and elections, equal opportunity for competing candidates, and proper election procedures which shall be constitutionally specified.
>
> . . . .

4

6.      Members shall have the right to a full and clear accounting of all union funds at all levels. Such accounting shall include, but not be limited to, periodic reports to the membership by the appropriate fiscal officers and periodic audits by officers elected for that purpose or by independent auditors not otherwise connected with the union.

7.      Members shall have the right to full participation, through discussion and vote, in the decision-making processes of the union, and to pertinent information needed for the exercise of this right. This right shall specifically include decisions concerning the acceptance or rejection of collective bargaining contracts, memoranda of understanding, or any other agreements affecting their wages, hours, or other terms and conditions of employment. All members shall have an equal right to vote and each vote cast shall be of equal weight.

8.      Charges against a member or officer shall be specific and shall be only on grounds provided in this Constitution. Accused members or officers shall have the right to a fair trial with strict adherence to due process. The accused shall be considered innocent until proven guilty.

25.     The AFSCME International Constitution goes on to provide in detail for a Judicial Procedure and a Judicial Panel to deal with, inter alia, any charges against a member. As indicated in the Bill of Rights, supra, this was consistent with every member's right to a "fair trial" to be held for any charges brought against that member.

26.     The AFSCME International Constitution specifically provides that it may charter subordinate bodies (such as Local 375), and it specifically provides that the subordinate bodies must be operated in accordance with the provisions of the AFSCME International Constitution. The AFSCME International Constitution states that the International Constitution itself is a "contract" between AFSCME and each subordinate body individually, so that

each subordinate body is "subject to the provisions of the International Constitution."

27.     In particular, the AFSCME International Constitution states that the "constitution of every subordinate body . . . shall conform to the provisions of the International Constitution including the provisions of the Bill of Rights."

28.     As an employee of defendants, plaintiff was entitled to the benefits of the "contract" between AFSCME and Local 375, which required Local 375 to conform to the provisions of the Bill of Rights and the International Constitution.

29.     Like the AFSCME International Constitution, the Local 375 specifies certain "Judicial Procedures" to be followed, which must be "conducted in accordance" with the terms of the International Constitution.

30.     In particular, the Local 375 Constitution states when any charges are brought, the "trial body" shall be the Executive Committee of Local 375, the accused shall be given a copy of the charges and a notice to appear for a trial to hear the charges, all in accordance with the provisions of the AFSCME International Constitution.

31.     The Local 375 Constitution specifically states that any "trial" for any "charges" shall be held "pursuant to Sections 12, 13 and 14 respectively of Article X of the International Constitution."

32.     Section 12 of Article X of the International Constitution, in turn, sets forth several procedural rights for any "accused person," including but not limited to the following:

6

*The right to receive a written copy of the charges within 15 days after they are filed, and at least 30 days before the trial.

*The right to file a written answer to the charges.

*The right to have the trial within 60 days after being served with the charges.

*The right to have at least 15 days advance notice of the date, time and place of the trial.

*The right to confront the accuser(s), including the right to cross-examine the accuser(s) and any witnesses.

*The right to present witnesses.

*The right to compel the production of pertinent union records.

*The right to be represented by his/her counsel of choice.

*The right to be presumed innocent.

*The right to appeal.

*The right to choose either an open or closed hearing.

33.     Section 14 of Article X of the International Constitution sets forth

certain obligations of any person bringing charges, including but not limited to

the following:

*The obligation to file the original charge in sufficient detail to allow the accused person a "full opportunity" to prepare a defense.

*The obligation to appear in person at the trial.

*The obligation to assume the burden of proof.

34.     Under the International Constitution, which must be followed by

Local 375 as a subordinate body, if the result of a trial is a decision adverse to

the accused person, the accused person has the right to appeal the adverse

decision to the next higher trial level.  For an affiliated local such as Local 375, the appeal is to the council trial body (in this case, DC 37).

35.    Decisions of the council trial body may then be appealed to the AFSCME Judicial Panel.

36.    When there is an appeal to a council trial body, the council trial body must proceed in the same manner for the hearing of the original charges, i.e., all the same procedural rights for the accused apply.

37.    While he was an employee of defendants, plaintiff engaged in several activities which are specifically protected by the Bill of Rights under the AFSCME International Constitution, and which are binding on defendants.

38.    Plaintiff engaged in several speech activities concerning the operations of the union and union affairs, which is activity protected by the Bill of Rights.

39.    Plaintiff also attempted to participate in the conduct of internal affairs of the union, free from employer domination, which is activity protected by the Bill of Rights.

40.    Plaintiff's activities included complaints about whether the union was holding fair and democratic elections, "at all levels of the union," as required by the Bill of Rights.  Plaintiff made specific complaints, in good faith, about conduct that he believed violated that provision of the Bill of Rights.

41.    Plaintiff's activities also included complaints made in good faith about the use of union funds, and plaintiff sought a "full and clear accounting of all union funds," a right specifically protected by the Bill of Rights.

42. Plaintiff's activities also included efforts to fully participate, through discussions and other activities, in the decision-making processes of the union, and efforts to obtain information needed for the exercise of this right. This, again, is activity specifically protected by the Bill of Rights. Some of plaintiff's activities in this area specifically related to collective bargaining agreements, again, an area of activity specifically protected by the Bill of Rights.

43. At various times during his employment, plaintiff was retaliated against by defendants, for engaging in activities specifically protected by the Bill of Rights. Such retaliation was a violation of the provisions of the Bill of Rights.

44. Part of the retaliation consisted of the imposition of disciplinary action on plaintiff. Such disciplinary action -- in addition to being retaliatory and therefore in violation of the Bill of Rights -- was also undertaken in complete violation of the procedural guarantees specified in the Bill of Rights and specified in other provisions in the International Constitution and the Local 375 Constitution.

45. First, on January 5, 1998, plaintiff was suspended (placed on involuntary sick leave) effective January 7, 1998. This suspension lasted until approximately January 22, 1998. At no point in time were any of the required procedural guarantees followed for this suspension. Plaintiff was never given notice of any charges. Plaintiff was never given any opportunity to confront his accusers or present evidence on his behalf. Plaintiff was never given any

trial. Plaintiff was never provided with any evidence that supposedly supported the unspecified charges against him. Although an adverse decision was made without any trial, plaintiff was never given any opportunity to appeal from this suspension.

46. On March 19, 1998, the then-current President of Local 375, Lou Albano, suspended plaintiff "without pay immediately." The letter suspending plaintiff (which is one sentence long) only accused plaintiff of "disruptive public behavior in the Local 375 office on March 19, 1998." The letter did not provide any more detailed specifics of the charges against plaintiff.

47. Again, none of the procedural requirements mandated by the AFSCME International Constitution and the Local 375 Constitution were followed. Plaintiff was not given a set of detailed written charges. His accuser(s) were not identified. He was given no relevant documents pertinent to this accusation. He was never given any kind of trial, and thus was never allowed to confront his accuser(s) or any witnesses against him, never allowed to see the "evidence" against him (if any), and never allowed to respond to the charges or to present evidence on his own behalf. Although a charge was brought against plaintiff, and disciplinary action imposed, without any trial whatsoever, plaintiff was never afforded any opportunity to appeal from that decision.

48. On April 9, 1998, this second suspension was rescinded.

49. In September, 1998, on various occasions, plaintiff was threatened with retaliation for engaging in activities that are specifically

10

protected by the Bill of Rights, as described in paragraphs 24-28, 37-42 supra. These threats of retaliation were made against plaintiff by various people, including members of Local 375's Executive Committee.

50. In September 1998, plaintiff complained in writing about these threats of retaliation. These written complaints were made to various persons, including but not limited to the management of Local 375 and the Executive Committee. In these written complaints, plaintiff specifically referred to the Bill of Rights, and asserted that he was being retaliated against, for activities that are protected by the Bill of Rights, and he claimed that the retaliation was therefore a violation of the Bill of Rights.

51. Immediately following these complaints of retaliation, a set of written charges were prepared against plaintiff, in a memo dated October 5, 1998, from Mel Levy, a member of the Executive Committee of Local 375. The written charges were provided to the Executive Board of Local 375, for consideration. However, the written charges were not provided to plaintiff. The written charges made three particular accusations against plaintiff. The written charges urged disciplinary action against plaintiff, including the possibility of termination.

52. The only charges against plaintiff all concerned activities engaged in by plaintiff that are specifically protected by the Bill of Rights, e.g., engaging in free speech activities about operations of the union, complaints that the right to fair and democratic elections had been impaired, and complaints about threats of retaliation for engaging in activities protected by

11

the Bill of Rights.  The charges against plaintiff were thus clearly retaliatory and yet another violation of the Bill of Rights.

53.     The charges against plaintiff were then considered by the Executive Board on October 7, 1998.  Plaintiff was handed the charges about 25 minutes before the meeting.  Plaintiff was given no written notice of the specific charges prior to this point, and was completely denied the 30 day advance notice mandated by the AFSCME International Constitution.

54.     Thus, once again, none of the procedural requirements set forth in the AFSCME Constitution or the Local 375 Constitution.  Plaintiff was given no advance notice of the charges against him.  Plaintiff was not given a trial. Plaintiff was not given any opportunity to confront his accuser(s), nor to see any of the "evidence" against him.  Plaintiff was not allowed to respond to the charges in any way, and he was not given any opportunity to present any evidence on his behalf.  Just as there was no trial at all, there was no open hearing of these charges.  Instead, the charges were considered in a private or closed session of the Executive Board.

55.     At the Executive Board meeting held on October 7, 1998, a request was made to fire plaintiff immediately.  Plaintiff was permitted to speak briefly, albeit not to respond to the charges against him.  Plaintiff specifically requested the right to have a hearing on the charges against him. The request to fire plaintiff immediately was rejected, and instead the Executive Board made a decision to suspend plaintiff immediately, with pay, for thirty (30) days.  The Executive Board also agreed to recognize plaintiff's

due process rights.  The Board agreed to have a full investigation and trial of the charges against plaintiff, affording plaintiff an opportunity to respond to the charges against him.

56.     In a letter dated October 8, 1998, plaintiff was given written notice that he was being suspended for 30 days based on a "direction received at our October 7, 1998 Executive Board Meeting."  Plaintiff still was not given any notice of any trial to be held on the charges, nor any opportunity to respond to the charges.  Instead, plaintiff was simply told "[u]nless you hear further, you are to return to work on November 9, 1998."

57.     Upon information and belief, Local 375 informed AFSCME's International President Gerald W. McEntee of the 30 day suspension of plaintiff, reflecting Local 375's belief that plaintiff's rights were governed by the AFSCME International Constitution and the Local 375 Constitution.

58.     Despite defendants' apparent initial decision to investigate and hold a trial regarding the charges against plaintiff, it ultimately did not follow this path.  Instead, a second meeting of the Executive Board was held on November 4, 1998.  This meeting was held less than 30 days after plaintiff was first told he was being suspended.  Plaintiff still was not given any written notice of the charges against him.  Plaintiff was not told that this November 4th meeting was being held to consider the charges against him, and he was given no notice of the meeting nor allowed to attend.

59.     At the November 4th Executive Board meeting, a decision was made to fire plaintiff effective November 6, 1998.

60.    Once again, none of the procedural requirements specified in the AFSCME International Constitution or the Local 375 Constitution were followed for plaintiff's termination. Plaintiff was given no notice of the charges against him, and no opportunity to respond to those charges. There was no trial on the charges against plaintiff, and plaintiff was not allowed to attend any proceeding to consider the charges against him. Plaintiff was not allowed to confront his accuser(s) or other witnesses against him, and was not given access to any of the "evidence" against him. Plaintiff was not allowed to testify or otherwise present evidence in his defense. Plaintiff was not given an open hearing on the charges, which were considered only in a closed session of the Executive Board.

61.    In short, every procedural right in the International Constitution and the Local 375 Constitution was violated. Plaintiff was not given any trial, much less a "fair trial." He was not given any due process, much less a "strict adherence to due process." He was not "considered innocent until proven guilty," but instead was considered guilty with no opportunity to prove his innocence.

62.    In a letter dated November 5, 1998, plaintiff was informed of the decision of the Executive Board to terminate him effective November 6, 1998. No other explanation was provided for the termination.

63.    All of the foregoing violations of the AFSCME International Constitution and the Local 375 Constitution took place while plaintiff was residing entirely in New Jersey. Plaintiff's original suspension in January,

1998, took place while plaintiff was living in New Jersey, and the letter informing him of the suspension was addressed to plaintiff at his home in New Jersey. Plaintiff's second suspension in March, 1998, also took place when plaintiff was living in New Jersey, and the letter informing him of the suspension was again addressed to plaintiff at his home in New Jersey. Plaintiff's third suspension in October, 1998, again took place when plaintiff was living in New Jersey, and the letter informing him of the suspension was addressed to plaintiff's home in New Jersey. While plaintiff was out on suspension in October and early November, 1998, he was living continuously in New Jersey, and the violations of the procedural guarantees under the AFSCME International Constitution and the Local 375 Constitution all took place while plaintiff was living in New Jersey. The termination took place while plaintiff was living in New Jersey (and when plaintiff was no longer permitted to come to work in New York), and the letter informing plaintiff of his termination was addressed to plaintiff at his home in New Jersey. This letter was sent by defendants to plaintiff's home in New Jersey via Federal Express.

64. Immediately upon being informed of his termination, plaintiff called the then acting President of Local 375 to request a hearing to challenge his termination. When these calls were ignored, plaintiff placed his request for a hearing on the termination in writing, and sent it to the acting President for Local 375, on or about November 13, 1998. This was less than a week after plaintiff was told he was fired. In writing, plaintiff specifically invoked his

right to "appeal" the termination, and specifically asked for information "in writing about the appeal process."

65.    Defendants' representatives agreed plaintiff was entitled to some kind of hearing on the termination and the charges against him, but they nonetheless ignored his repeated requests for a hearing.

66.    Plaintiff thereafter repeated his request for a hearing on the charges against him, both verbally and in writing, about a dozen times over the next several months.  Defendants' representatives agreed that plaintiff was entitled to a hearing on the charges against him, but plaintiff still was never afforded that hearing.

67.    The AFSCME International Constitution and the Local 375 Constitution constitute a binding contract, which entitles plaintiff to certain substantive and procedural guarantees in connection with his employment.

68.    By the foregoing actions, defendants have failed to follow the provisions of the AFSCME International Constitution and the Local 375 Constitution.

69. Defendants have thus breached their contract with and promises to plaintiff.

70.    As a result of the breach of the contract and promises, plaintiff has been damaged, losing wages, benefits and other privileges of employment.

WHEREFORE, plaintiff demands judgment and an order granting him:

16

A.   Notice of the charges against him, and a full trial on those charges, with all of the procedural guarantees specified in the AFSCME International Constitution and the Local 375 Constitution;

B.   Reinstatement with full back pay, or in the alternative, back pay and future pay until the date that plaintiff otherwise would have ceased working;

C.   Payment or credit for all lost benefits, including payment for all retirement benefits based on the projected salary at the time of retirement;

D.   Compensatory damages, including damages for pain and suffering and for injury to plaintiff's personal and professional reputation;

E.   Punitive damages;

F.   Costs and disbursements of this suit, including reasonable attorney's fees;

G.   Pre-judgment interest; and

H.   Such other relief as this Court deems just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff demands trial by jury on all actions triable to a jury.

DWYER & DUNNIGAN, L.L.C.
Attorneys for Plaintiff

By: _____

Andrew Dwyer

Dated: April ____, 2004

18

## CERTIFICATION

The undersigned hereby certifies that to the best of his knowledge and

belief, there are no other parties who should be joined in this action and that

there are no other actions pending concerning the above claims.

DWYER & DUNNIGAN, L.L.C.
Attorneys for Plaintiff

By: _____

Andrew Dwyer

Dated: April ___, 2004

## DESIGNATION OF TRIAL COUNSEL

PLEASE TAKE NOTICE that pursuant to R. 4:25-4, Andrew Dwyer is

hereby designated as trial counsel.

DWYER & DUNNIGAN, L.L.C.
Attorneys for Plaintiff

By: _____

Andrew Dwyer

Dated: April ____, 2004

# EXHIBIT B

1                                                    1

2    UNITED STATES DISTRICT COURT

3    DISTRICT OF NEW JERSEY

4    - - - - - - - - - - - - - - - - - - -x

5    THOMAS K. DAWES,

6                              Plaintiff,
                    -vs-                  Civil Action No.
7                                         04-4002 (JLL)
     LOCAL 375, CIVIL SERVICE TECHNICAL
8    GUILD, DISTRICT COUNCIL 37, AMERICAN
     FEDERATION OF STATE, COUNTY, AND
9    MUNICIPAL EMPLOYEES, AFL-CIO,

10                             Defendants.

11   - - - - - - - - - - - - - - - - - - -x

12                       August 4, 2005
                         10:16 a.m.
13
                                 **ORIGINAL**
14

15            Deposition of THOMAS K. DAWES,

16       pursuant to notice, at the offices of

17       Dwyer & Dunnigan, LLC, 17 Academy Street,

18       Newark, New Jersey, before Michele

19       Nardone, a Certified Shorthand Reporter,

20       Registered Professional Reporter, and

21       notary public of the State of New York.

22

23
                    PAUL BECKER, C.S.R., P.C.
24                    222 Wellington Road
                     Mineola, New York 11501
25               (718) 939-5741  (516) 739-8843

```
 1                           Dawes
 2    October 7 David Grant raised with you concerns
 3    regarding your use of the local's fax machine
 4    and computer?
 5              A    No, I do not.
 6              Q    I'm handing you 19.
 7                   Would you take a second to review
 8    that.
 9              A    Okay.  Yes.  Okay.  I read it.
10              Q    Do you know who M. Levy is?
11              A    Yes.  I believe the M. stands for
12    Mel, and I believe that is Mel Levy, president
13    of Chapter 2, Local 375.
14              Q    Did you ever see this Exhibit 19
15    prior to your termination in November?
16              A    Yes.
17              Q    Do you remember the first time you
18    saw what's been marked as Exhibit 19?
19              A    Yes.  The first time I saw it was
20    right before the executive committee meeting in
21    early October, which I believe was October 7.  I
22    believe that's a Wednesday.  So sometime around
23    6:00 p.m. I was handed this memo.
24              Q    By whom?
25              A    I can't presently recall exactly who
```

PAUL BECKER, C.S.R., P.C.

150

1                         Dawes

2    handed it to me, but it was a Local 375

3    official, a member of the executive committee.

4          Q    Prior to October 7, had Mr. -- I'm

5    sorry.

6               Is it LEV-vee (phonetic) or LEE-vee

7    (phonetic)?

8          A    I think it's LEE-vee.

9               MR. VITALE:  Of course, the

10              court reporter is going to say Levy

11              or Levy, so it doesn't matter how

12              we pronounce his name, because the

13              transcript will be right.

14         Q    Did you have any conversations with

15   Mr. Levy about his intention to submit such a

16   memo?

17         A    No.

18         Q    Did you have any conversation about

19   the substance of his memo?

20              MR. DWYER:  At any time?

21              MR. VITALE:  At any time.

22         A    Well, in the executive committee

23   meeting he made statements, and I made

24   statements.  So there was a limited back and

25   forth there.

                  PAUL BECKER, C.S.R., P.C.

151

1                          Dawes

2          Q     How about prior to the executive

3     committee meeting on October 7?

4          A     No, no.  There was no forewarning or

5     no discussion.

6          Q     During the October 7 meeting was

7     there any discussion of the international

8     constitution?

9          A     Yes.

10         Q     What was that discussion?

11         A     Mr. Mike Gimbel, who was an

12    executive committee member and an elected chair,

13    I think it was political activities or political

14    action chair, when this document was presented

15    to the members, he was one of the first to speak

16    about it, or first or second.

17               And he said that he was bringing the

18    motion for my termination based on the

19    international constitution article 9, section

20    43, which empowers a local's executive board to

21    suspend immediately staff employees or I suppose

22    elected officers.  So that was cited right at

23    the very beginning.

24         Q     Was that the only discussion of the

25    AFSCME constitution?

                  PAUL BECKER, C.S.R., P.C.

152

1                          Dawes

2          A     I believe in the section it refers

3     to an imminent danger, that I was an imminent

4     danger to the local and to AFSCME, and that was

5     repeated several times during the meeting, the

6     phrase "imminent danger."  But that's my memory

7     basically seven years later.

8          Q     Was there any discussion during the

9     October 7 meeting as to whether or not you could

10    be terminated without any hearing?

11         A     Yes.

12         Q     What was the discussion?

13         A     Well, I was given a brief

14    opportunity to speak, and I asked for a hearing.

15    And the executive committee agreed to give me a

16    hearing.

17              So the original motion to terminate

18    me immediately was changed to suspension with

19    pay pending an investigation and hearing.

20         Q     Did anyone during the October 7

21    meeting discuss the Local 375 constitution?

22         A     Not that I can recall.

23         Q     Did you subsequently have any

24    discussions with Joseph Cook about what

25    transpired at the October 7 meeting?

                    PAUL BECKER, C.S.R., P.C.

153

1                             Dawes

2            A    Yes.

3            Q    How many discussions did you have

4      with Mr. Cook?

5            A    I had one meeting with Mr. Cook.

6            Q    Do you recall when that was?

7            A    I can't recall the date as I sit

8      here before you.

9            Q    Do you recall if it was in November?

10           A    I know it was around -- it was

11     around October or November, but I can't recall

12     specifically.

13           Q    Do you remember where it was?

14           A    I remember it was in a fancy hotel

15     in downtown Manhattan, fancy schmancy.

16           Q    What do you recall of your

17     discussion with Mr. Dawes -- I'm sorry, with

18     Mr. Cook at the hotel?

19           A    Well, let's see.  There was a little

20     preliminary stuff, because he is from Maryland

21     and I grew up in Maryland, so we talked a little

22     bit about Maryland.

23                And then, then I got into the crux

24     of the matter, which is -- which was that I had

25     been terminated unfairly, and I just -- it was a

                      PAUL BECKER, C.S.R., P.C.

154

1                            Dawes

2    wide-ranging discussion.  And I just said, look,

3    I have been, you know, I have been threatened

4    with physical assault.  I have been physically

5    assaulted.

6                    There is massive fraud going on

7    here.  There is vote fraud.  I know there is

8    financial fraud.  There is missing money in our

9    local.  There is missing money in DC 37.

10                   This is a really serious thing, and

11   it's not fair that as a whistle blower and as

12   somebody who is organizing reform to rectify the

13   situation that I be punished with termination,

14   you know.  The people who are taking action

15   against me, you know, I think they had something

16   to hide.

17                   So it was kind of a -- part of it

18   was, you know, he had some specific questions,

19   but part of it was just a general plea to

20   AFSCME.  You know, he was McEntee's

21   representative.  Look, we got to deal with this.

22                   This is a horrendous besmirchal

23   on -- besmirchal, besmirchment, but it's a

24   stain, stain, a stain on AFSCME's honor, and it

25   hurts the whole labor movement in New York City.

PAUL BECKER, C.S.R., P.C.

155

1                          Dawes

2    And it's a terrible scandal, and I want help.

3              You know, then he asked specifics,

4    you know.

5         Q    Was it your understanding that he

6    was there to investigate whether or not there

7    had been money misappropriated at Local 375?

8         A    He was specifically there because I

9    had been terminated under the -- or suspended

10   and then terminated under article 9, section 43.

11   So that the international president is informed

12   and then sends up a personal representative to

13   report to him.

14             So he was the actuator or the

15   catalyst for his presence in front of me, was my

16   termination.

17        Q    Do you recall whether there was any

18   discussion as to whether you were suspended

19   under article 9 as opposed to under the

20   authority of Local 375's constitution?

21             MR. DWYER:  Asked and

22        answered.

23             Go ahead.  Answer it again.

24        A    It is my memory that I -- I mean, I

25   knew why he was there was because of this thing

PAUL BECKER, C.S.R., P.C.

156

1                           Dawes

2    set in motion by article 9, section 43.  The

3    international wouldn't have spent the money to

4    send this guy up there and rent hotel rooms for

5    him and then have him spend time with me.  I

6    don't know how many nights he was in New York

7    City but, you know, it wouldn't have occurred.

8               And so I'm sure I alluded to article

9    9, section 43, but it wasn't the focus of my

10   discussion, because it was so obvious that

11   that's what's going on.

12        Q     Did he mention that he had met with

13   31 members of the executive board the prior day

14   when you met with him in the hotel room?

15        A     As I presently sit here before you,

16   I can't remember that he mentioned that.

17        Q     Do you recall whether he mentioned

18   to you that all the members of the executive

19   board, with the exception of Mr. Commer, said

20   that the suspension was done not under the

21   international constitution but under the local

22   constitution?  Did he convey that to you?

23        A     I don't, you know, my memory of

24   this, again, it's almost seven years, and my

25   memory is that he did not.

                PAUL BECKER, C.S.R., P.C.

# EXHIBIT C

RECEIVED

NOV 2 3 2005

⠀T 8:30⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀M
WILLIAM T. WALSH, CLERK

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

THOMAS K. DAWES,

    Plaintiff,

    v.

LOCAL 375, CIVIL SERVICE
TECHNICAL GUILD, DISTRICT
COUNCIL 37, AMERICAN
FEDERATION OF STATE, COUNTY
AND MUNICIPAL EMPLOYEES,
AFL-CIO,

    Defendants.

: Hon. Jose L. Linares, U.S.D.J.

: Civil Action No. 04-4002 (JLL) (RJH)

**FINAL PRETRIAL ORDER**

    A pretrial conference having been held before the Honorable Ronald J.

Hedges, U.S.M.J., Dwyer & Dunnigan, L.L.C., having appeared for plaintiff

and Cohen, Weiss and Simon LLP having appeared for defendants, this Final

Pretrial order is hereby entered:

1

3.    STIPULATION OF FACTS (Set forth in numbered paragraphs all uncontested facts, including all answers to interrogatories and admissions, to which the parties agree.)

1.    Thomas K. Dawes, plaintiff herein, is a citizen of the United States residing in the State of New Jersey, County of Essex.

2.    Local 375, Civil Service Technical Guild (hereinafter "Local 375"), is a labor organization, an unincorporated association with a place of business at 125 Barclay Street, New York, New York 10007.

3.    At all material times herein, Local 375 has been a chartered subordinate body of a multi-state labor organization, the American Federation of State, County and Municipal Employees, AFL-CIO (hereinafter "AFSCME"), which maintains its national headquarters in Washington, D.C.

4.    District Council 37 (hereinafter "DC 37") is an affiliate of AFSCME which is also affiliated with several local unions, including Local 375, to whom it provides various services and benefits.

5.    Plaintiff remained continuously employed until a meeting of Local 375's Executive Board was held on November 4, 1998, at which time the Board acted to terminate plaintiff's employment effective November 6, 1998.

6.    During the period of plaintiff's employment, AFSCME had an International Constitution.

7.    Under the terms of the International Constitution, "any person" who meets any of the requirements specified in the International Constitution

7

for membership "shall be eligible for membership in a local union duly
chartered by and regularly affiliated with" AFSCME.

8.    In addition to other categories specified in the International
Constitution, membership is extended to any "full-time staff employee of any
subordinate body of the Federation [AFSCME].  If employed by a local union,
such employee shall be eligible for membership in the local union by which
such employee is employed."

9.    Plaintiff was a member of AFSCME and of Local 375, at all times
relevant herein.

10.    Local 375 also adopted its own Constitution for its members.

11.    Plaintiff was provided with a copy of both the AFSCME
International Constitution and a copy of the Local 375 Constitution, and was
familiar with its provisions.

12.    Members of AFSCME and Local 375 were entitled to the benefits
of the "Bill of Rights for Union Members," which is specified in the
International Constitution, and which states in part as follows:

2.    Members shall suffer no impairment of freedom of speech
concerning the operations of this union.  Active discussion of union
affairs shall be encouraged and protected within this organization.

3.    Members shall have the right to conduct the internal
affairs of the union free from employer domination.

4.    Members shall have the right to fair and democratic
elections, at all levels of the union.  This includes due notice of
nominations and elections, equal opportunity for competing candidates,
and proper election procedures which shall be constitutionally
specified.

8

. . . .

6.     Members shall have the right to a full and clear accounting of all union funds at all levels. Such accounting shall include, but not be limited to, periodic reports to the membership by the appropriate fiscal officers and periodic audits by officers elected for that purpose or by independent auditors not otherwise connected with the union.

7.     Members shall have the right to full participation, through discussion and vote, in the decision-making processes of the union, and to pertinent information needed for the exercise of this right. This right shall specifically include decisions concerning the acceptance or rejection of collective bargaining contracts, memoranda of understanding, or any other agreements affecting their wages, hours, or other terms and conditions of employment. All members shall have an equal right to vote and each vote cast shall be of equal weight.

8.     Charges against a member or officer shall be specific and shall be only on grounds provided in this Constitution. Accused members or officers shall have the right to a fair trial with strict adherence to due process. The accused shall be considered innocent until proven guilty.

13.     Articles X and XI of the AFSCME International Constitution go on to provide in detail for a Judicial Procedure and a Judicial Panel to deal with, inter alia, any charges against a member.

14.     The AFSCME International Constitution specifically provides that AFSCME may charter subordinate bodies, and it specifically provides that the subordinate bodies must be operated in accordance with the provisions of the AFSCME International Constitution. The AFSCME International Constitution states that the International Constitution itself is a "contract" between AFSCME and each subordinate body individually, so that each subordinate body is "subject to the provisions of the International Constitution."

9

15. The AFSCME International Constitution states that the "constitution of every subordinate body . . . shall conform to the provisions of the International Constitution including the provisions of the Bill of Rights."

16. Like the AFSCME International Constitution, the Local 375 specifies certain "Judicial Procedures" to be followed, which must be "conducted in accordance" with the terms of Article X of the International Constitution.

17. The Local 375 Constitution states when any charges are brought, the "trial body" shall be the Executive Committee of Local 375, the accused shall be given a copy of the charges and a notice to appear for a trial to hear the charges, all in accordance with the provisions of Article X of the AFSCME International Constitution.

18. The Local 375 Constitution specifically states that any "trial" for any "charges" shall be held "pursuant to Sections 12, 13 and 14 respectively of Article X of the International Constitution."

19. Section 12 of Article X of the International Constitution sets forth several procedural rights for any "accused person," including but not limited to the following:

*The right to receive a written copy of the charges within 15 days after they are filed, and at least 30 days before the trial.

*The right to file a written answer to the charges.

*The right to have the trial within 60 days after being personally served with the charges.

10

*The right to have at least 15 days advance notice of the date, time and place of the trial.

*The right to confront the accuser(s), including the right to cross-examine the accuser(s) and any witnesses.

*The right to present witnesses.

*The right to compel the production of pertinent union records.

*The right to be represented by his/her counsel of choice.

*The right to be presumed innocent unless proven guilty.

*The right to appeal.

*The right to choose either an open or closed hearing.

20.   Section 14 of Article X of the International Constitution sets forth certain obligations of any person bringing charges, including but not limited to the following:

*The obligation to file the original charge in sufficient detail to allow the accused person a "full opportunity" to prepare a defense.

*The obligation to appear in person at the trial.

*The obligation to assume the burden of proof.

21.   Under the International Constitution, which must be followed by Local 375 as a subordinate body, if the result of a trial is a decision adverse to the accused person, the accused person has the right to appeal the adverse decision to the next higher trial level. For an affiliated local such as Local 375, the appeal is to the council trial body (in this case, DC 37).

22.   Decisions of the council trial body may then be appealed to the AFSCME Judicial Panel.

23.   When there is an appeal to a council trial body, the council trial body must proceed in the same manner for the hearing of the original charges, i.e., all the same procedural rights for the accused apply.

24.   On January 5, 1998, plaintiff was suspended (placed on involuntary sick leave) effective January 7, 1998. This suspension lasted until approximately January 22, 1998. At no point in time was plaintiff given notice of any charges against him under Article X of the AFSCME Constitution, nor was a trial conducted under that provision.

25.   On March 19, 1998, the then-current President of Local 375, Lou Albano, suspended plaintiff "without pay immediately." The letter suspending plaintiff (which is one sentence long) accused plaintiff of "disruptive public behavior in the Local 375 office on March 19, 1998."

26.   On April 9, 1998, the March 19, 1998 suspension was rescinded.

27.   In a letter dated October 8, 1998, plaintiff was given written notice that he was being suspended for 30 days based on a "direction received at our October 7, 1998 Executive Board Meeting." Plaintiff was not given any notice of any trial to be held on any charges against him, nor any opportunity to respond to any charges. Plaintiff was told "[u]nless you hear further, you are to return to work on November 9, 1998."

28.   A second meeting of the Executive Board was held on November 4, 1998. This meeting was held less than 30 days after plaintiff

12

was first told he was being suspended. Plaintiff was not given any written notice of any charges against him. Plaintiff was given no notice of the meeting nor allowed to attend.

29.   At the November 4th Executive Board meeting, a decision was made to fire plaintiff effective November 6, 1998.

30.   In a letter dated November 5, 1998, plaintiff was informed of the decision of the Executive Board to terminate him for cause effective November 6, 1998. The letter provided no explanation for the termination.

# EXHIBIT D

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

------------------------------------------------------x
                                      :
THOMAS DAWES,                         :
                                      :   Hon. Jose L. Linares, U.S.D.J.
                    Plaintiff,        :
                                      :   Civil No. 04-4002 (JLL) (RJH)
          - v. -                      :
                                      :
LOCAL 375, CIVIL SERVICE              :
TECHNICAL GUILD, et al.,              :
                                      :
                    Defendant(s).     :
                                      :
------------------------------------------------------x

## DECLARATION OF LARRY P. WEINBERG

I, Larry P. Weinberg, declare under penalty of perjury:

1.      I am currently General Counsel to the American Federation of State,

County and Municipal Employees, AFL-CIO ("AFSCME") and have served in this

position for fifteen years and have served as counsel to AFSCME for more than

thirty years. In this capacity, I advise the organization's officers, affiliates and

Judicial Panel on a variety of issues, including the construction, interpretation and

application of provisions of the International Constitution.

2.      AFSCME does not, and has never, interpreted the International

Constitution, in whole or in part, as creating employment rights for staff employees

of the International or its subordinate bodies.

3.   It is, and always has been, the International's view that nothing in the International Constitution limits the basis upon which a staff employee of the International Union or a subordinate body may be suspended, terminated or otherwise disciplined for employment related conduct, even if that staff employee is a member.

4.   It is, and always has been, the International's view that nothing in the International Constitution requires charges to be filed against a staff employee before a subordinate body acts as an employer to suspend, terminate or otherwise discipline the employee, even if that staff employee is a member, and even if the disciplinary action is based on conduct that would have been a chargeable offense under Article X, Section 2 of the International Constitution if charges had been filed against the employee by a member.

5.   It is, and always has been, the International's view that Article X, Section 1 of the International Constitution permits a member to file charges against someone for actions taken while a staff employee of the International Union or a subordinate body.  If charges are filed against a staff employee by a member pursuant to Article X. Section 2, such staff employee is afforded the right to have a hearing and a review of any discipline imposed in accordance with the procedures set forth in Article X of the International Constitution.

6.    It is, and always has been the International's view that disciplinary action initiated and taken by the employing authority of the International Union or a subordinate body against an employee of such entity is not subject to Article X of the International Constitution unless the employing authority chooses to take such action pursuant to that procedure.

7.    It is, and always has been, the International's view that the "Bill of Rights for Union Members" of the Preamble of the International Constitution, as its title suggests, sets forth rights enjoyed by members, not rights enjoyed by staff employees of the International or its subordinate bodies. For instance, under the Bill of Rights, "Members shall suffer no impairment of freedom of speech." It is, and always has been, the International's view that this right of free speech does not protect a staff employee from suspension, termination or other discipline based on his or her speech, even if that staff employee happens to be a member.

8.    I understand that Thomas Dawes asserts that (a) he was employed by Local 375, DC 37 and the International and (b) he was suspended and terminated in violation of the International Constitution's procedural guarantees of Article X and substantive guarantees of the Bill of Rights. As set forth above, it is, and always has been, the International's view that nothing in the International Constitution places any procedural or substantive limitations upon his employer's ability to suspend or terminate his employment.

- 3 -

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed at Washington D.C. this 2nd day of February 2006.

Larry P. Weinberg

# EXHIBIT E

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

DWYER & DUNNIGAN, L.L.C.
17 Academy Street, Suite 1010
Newark, New Jersey 07102
(973) 242-3636
Andrew Dwyer (AD-7793)
Attorneys for Plaintniff

---

THOMAS K. DAWES,

          Plaintiff,

          v.

LOCAL 375, CIVIL SERVICE
TECHNICAL GUILD, DISTRICT
COUNCIL 37, AMERICAN
FEDERATION OF STATE, COUNTY
AND MUNICIPAL EMPLOYEES,
AFL-CIO,

          Defendants.

: Hon. Jose L. Linares, U.S.D.J.

: Civil Action No. 04-4002 (JLL) (RJH)

**DECLARATION OF ROY COMMER**

---

Roy Commer hereby declares under penalty of perjury as follows:

1.    I am fully familiar with the matters set forth herein.

2.    I make this Declaration in support of plaintiff's motion for summary judgment.

3.    I was elected President of the Civil Service Technical Guild, Local 375 in 1998.

4.    On October 7, 1998, I attended a meeting of the Executive Board of Local 375.

1

5.    At the meeting, a set of charges were presented by Brother Mel Levy. The charges were in writing, and were dated October 5, 1998. A true and correct copy of the charges is attached to this Declaration as Exhibit A.

6.    The charges were brought against Tom Dawes, and accused Mr. Dawes of various forms of wrongdoing. Based on these charges, Mr. Dawes' dismissal was sought.

7.    The charges against Mr. Dawes were voted on. Mr. Levy made an amendment to the charges, seeking that Mr. Dawes be suspended immediately, pending an investigation of the charges, to determine whether he should be dismissed or not. The suspension was to be a 30 day suspension with pay. This motion was passed.

8.    It was also proposed at this meeting that a committee would be established by me to investigate and report on the charges to the Executive Board, by November 4, 1998. This motion was also passed.

9.    A true and correct copy of the draft minutes from this October 7, 1998 meeting are attached to this Declaration as Exhibit B.

10.    The next day, October 8, 1998, I sent a letter to Mr. Dawes, informing him of his 30 day suspension, based on the actions taken at the Executive Board meeting. A true and correct copy of my letter to Mr. Dawes is attached to this Declaration as Exhibit C.

11.    The suspension of Mr. Dawes by the Executive Board was made pursuant to Article 9, Section 43, of the International Constitution of the American Federal of State, County and Municipal Employees (AFSCME). A

2

true and correct copy of the relevant portions of Article 9, Section 43, of the AFSCME Constitution are attached to this Declaration as Exhibit D.  This is the Constitution provision that allows a subordinate body of AFSCME (such as Local 375) to suspend a staff employee.  However, as stated in Article 9, Section 43, such a suspension can only last 30 days.  Further, under Article 9, Section 43, the local must notify AFSCME, which is then supposed to conduct an investigation of the suspension.  A 30 day suspension under Article 9, Section 43, does not abrogate the member's due process rights under the Constitution, regarding any charges brought against the member.

12.    As required by Article 9, Section 43, I notified Gerald McEntee, AFSCME President, of the suspension of Mr. Dawes.  A true and correct copy of this notification, dated October 9, 1998, is attached to this Declaration as Exhibit E.

13.    Also, consistent with the instructions of the Executive Board, a committee was established within Local 375, to investigate the charges against Mr. Dawes.  True and correct copies of internal union memos related to the formation of this committee are attached to this Declaration as Exhibit F.

14.    In response to my letter to Mr. McEntee, he sent me a letter dated October 26, 1998, informing me that AFSCME had designated Joseph Cook to investigate the suspension, pursuant to Article 9, Section 43.  In his letter to me, Mr. McEntee correctly noted that regardless of the investigation of the suspension, there were also specific judicial procedures governing any

3

charges or actions taken against a member, spelled out in Article 10 of the Constitution. As Mr. McEntee stated in his letter:

> I remind you that this process is completely separate and apart from the judicial procedure spelled out in Article X of the International Constitution, other than as specified in Article IX, Section 43.

A true and correct copy of Mr. McEntee's October 26, 1998 letter to me is attached to this Declaration as Exhibit G.

15.   I informed the Executive Committee of the fact that Mr. McEntee had designated Mr. Cook to investigate the suspension. I told the Executive Committee in writing of a meeting with Mr. Cook on November 2, 1998. A true and correct copy of my memo to the Executive Committee is attached to this Declaration as Exhibit H.

16.   At that November 2, 1998 meeting, I became very concerned that misrepresentations were being made about the manner in which Mr. Dawes was suspended. Specifically, some individuals represented to Mr. Cook, the investigator, that the suspension of Mr. Dawes had nothing to do with the AFSCME Constitution.

17.   These statements to Mr. Cook were incorrect. As I and other individuals at the November 2, 1998, meeting told Mr. Cook, in fact, when Mr. Dawes was suspended, the AFSCME Constitution was specifically cited as the basis for his suspension. Indeed, it was pointed out to Mr. Cook that when asked for the basis for the suspension of Mr. Dawes, the individuals who were advocating that he should be suspended emphatically stated that the suspension was being performed under the AFSCME Constitution.

4

18.     During the meeting with Mr. Cook, myself and others also pointed out that there was a audio tape recording of the meeting when Mr. Dawes was suspended.  The tape recording supported our contention that Mr. Dawes was suspended under the terms of the AFSCME Constitution.

19.     I recounted these facts, which were presented to Mr. Cook on November 2, 1998, in a letter to Mr. McEntee dated November 3, 1998.  A true and correct copy of my November 3, 1998 letter to Mr. McEntee is attached to this Declaration as Exhibit I.

20.     Subsequently, at a meeting of the Executive Board on November 4, 1998, a motion was passed that lifted the suspension of Mr. Dawes, but terminated his employment.  A true and correct copy of the relevant sections of the draft minutes of the November 4, 1998 Executive Board meeting are attached to this Declaration as Exhibit J.

21.     Based on my involvement in the events at the time, there is no question in my mind that Mr. Dawes was suspended, and then fired, based on the charges that were presented against him at the October 7, 1998 Executive Board meeting.  The only basis for those actions was under the AFSCME Constitution, which sets out specific procedures for how charges against a member should be handled.

I declare under penalty of perjury that the foregoing is true and correct.

Roy Commer

Executed on January 16th, 2006

6